**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (257370)
*jack@jackfitzgeraldlaw.com*
MEHRAN TAHOORI (283313)
*mehran@jackfitzgeraldlaw.com*
The Palm Canyon Building
2870 Fourth Avenue, Suite 205
San Diego, CA 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

**LAW OFFICES OF RONALD A. MARRON, APLC**
RONALD A. MARRON (175650)
*ron@consumersadvocates.com*
SKYE RESENDES (278511)
*skye@consumersadvocates.com*
ALEXIS M. WOOD (270200)
*alexis@consumersadvocates.com*
651 Arroyo Drive
San Diego, CA 92103
Phone: (619) 696-9006
Fax: (619) 564-6665

*Counsel for Plaintiff and the Proposed Classes*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEO HARRIS, on behalf of himself, all others similarly situated and the general public,<br><br>Plaintiff,<br><br>v.<br><br>CVS PHARMACY, INC.,<br><br>Defendant. | Case No: EDCV13-2329-ABC (AGRx)<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CVS'S MOTION TO DISMISS**<br><br>Judge:     Audrey B. Collins<br>Date:       March 10, 2014<br>Time:      10:00 a.m. |

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

FACTS ........................................................................................... 2

ARGUMENT .................................................................................. 4

    I.    PLAINTIFF SATISFIES THE APPLICABLE PLEADING
        STANDARD ...................................................................... 4

    II.   PLAINTIFF'S ULTRA TESTING SUPPORTS HIS CLAIMS ........ 5

        A.   Ultra's Failure to Adequately Dissolve Raises a Plausible Claim
            that its "6X Better Absorption" Representations are False ........ 5

        B.   Plaintiff's Claims Are Supported by Proper Testing, Applicable
            to Ultra ...................................................................... 6

        C.   That USP Testing is Voluntary Does Not Render Implausible
            Plaintiff's Allegations that Ultra is Falsely Advertised ......... 8

    III.  PLAINTIFF STATES VALID WARRANTY CLAIMS ................ 8

        A.   Plaintiff has Sufficiently Alleged Facts in Support of his
            Express and Implied Warranty Claims ............................. 8

            i.   Express Warranty ............................................... 9

            ii.  Implied Warranties of Merchantability and Fitness ..... 10

        B.   Plaintiff's Magnuson-Moss Warranty Act Claims are not
            Barred ..................................................................... 11

    IV.  PLAINTIFF STATES VALID FALSE ADVERTISING CLAIMS ...... 14

i

*Harris v. CVS Pharmacy, Inc.*, No. 13-edcv-2329-ABC (AGRx)
PLAINTIFF'S OPPOSTION TO CVS'S MOTION TO DISMISS

V.      SAFE HABOR DOES NOT APPLY ...............................................14

VI.     PLAINTIFF CAN INVOKE RHODE ISLAND LAW FOR FALSE
        ADVERTISING EMANATING FROM CVS'S RHODE ISLAND
        HEADQUARTERS .......................................................................15

        A.      Applying Rhode Island Law Comports With Due Process ...................17

        B.      CVS Admits Rhode Island Law is Identical to California Law
                and Has Not Otherwise Shown Another State's Law Should
                Apply ...........................................................................18

CONCLUSION ................................................................................19

ii

*Harris v. CVS Pharmacy, Inc.*, No. 13-edcv-2329-ABC (AGRx)
PLAINTIFF'S OPPOSITION TO CVS'S MOTION TO DISMISS

# TABLE OF AUTHORITIES

## Cases

*Aguilar v. Boulder Brands, Inc.*,
  2013 WL 2481549 (S.D. Cal. June 10, 2013).....................................................5

*Allen v. Hyland's Inc.*,
  2013 WL 1748408 (C.D. Cal. Apr. 11, 2013) ...................................................13

*Bates v. Gen. Nutrition Ctrs., Inc.*,
  897 Fed. Supp. 2d 1000 (C.D. Cal. 2012).......................................................12

*Bronson v. Johnson & Johnson, Inc.*,
  2013 WL 5731817 (N.D. Cal. Oct. 22, 2013).....................................................5

*Bruno v. Eckhart Corp.*,
  280 F.R.D. 540 (C.D. Cal. 2012) ......................................................................19

*Cel-Tech Commc'n, Inc. v. L.A. Cellular*,
  20 Cal. 4th 163 (1999) ......................................................................................15

*Chavez v. Blue Sky Natural Beverage Co.*,
  268 F.R.D. 365 (N.D. Cal. 2010).......................................................................18

*Consumer Justice Ctr. v. Olympian Labs, Inc.*,
  99 Cal. App. 4th 1056 (2002) ...........................................................................15

*Cooper v. Pickett*,
  137 F.3d 616 (9th Cir. 1993)...............................................................................4

*Decker v. GlenFed, Inc.*,
  42 F.3d 1541 (9th Cir. 1994)...............................................................................4

*Dorfman v. Nutramax Labs., Inc.*,
  2013 WL 5353043 (S.D. Cal. Sept. 23, 2013) ....................................................5

*Erdman Co. v. Phoenix Land & Acquisition, LLC*,
  2013 WL 3772675 (W.D. Ark. July 17, 2013) ...................................................4

*Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155 (C.D. Cal. 2012)..................18

iii

*Forcellati v. Hyland's, Inc.*,
    876 F. Supp. 2d 1155 (C.D. Cal. 2012) .......................................................13

*Hauk v. JP Morgan Chase Bank USA*,
    552 F.3d 1114 (9th Cir. 2009) ....................................................................15

*In re Clorox Consumer Litig.*,
    894 F. Supp. 2d 1224 (N.D. Cal. 2012) .....................................................17

*In re Horizon Organic Milk Plus Omega-3 Mktg. & Sales Practice Litig.*,
    955 F. Supp. 2d 1311 (S.D. Fla. July 24, 2013)..........................................15

*In re MDC Holdings Sec. Litig.*,
    754 F. Supp. 785 (S.D. Cal. 1990) .............................................................19

*In re Seagate Techs. Sec. Litig.*,
    115 F.R.D. 264 (N.D. Cal. 1987).................................................................19

*Kanter v. Warner-Lambert Co.*,
    99 Cal. App. 4th 780 (2002) .......................................................................12

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ......................................................................4

*Kearny v. Salomon Smith Barney*,
    39 Cal. 4th 95 (2006) ..................................................................................19

*Klaxon v. Stentor Elec. Manuf. Co.*,
    313 U.S. 487 (1941) ....................................................................................16

*Kowalsky v. Hewlett-Packard Co.*,
    2011 WL 3501715 (N.D. Cal. Aug. 10, 2011) ...............................................4

*Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*,
    940 F.2d 397 (9th Cir. 1991)..........................................................................4

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ..........................16

*Mocek v. Alfa Leisure, Inc.*,
    114 Cal. App. 4th 402 (2003) .....................................................................10

iv

*Moore v. Kayport Package Express, Inc.*,
   885 F.2d 531 (9th Cir. 1989) ................................................................4

*Parkinson v. Hyundai Motor Am.*,
   258 F.R.D. 580 (C.D. Cal. 2008) ........................................................18

*Pecover v. Elec. Arts Inc.*,
   2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) ......................16, 17, 18

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ...........................................................................17

*Pokorny v. Quixtar, Inc.*,
   601 F.3d 987 (9th Cir. 2010) .............................................................19

*Roberts Distrib. Co. v. Kaye-Halbert Corp.*,
   126 Cal. App. 2d 664 (1954) ................................................................9

*Rogers v. Dow Agrosciences, LLC*,
   2006 WL 3147393 (W.D. Va. Oct. 31, 2006) ....................................12

*Rojas v. Gen. Mills, Inc.*,
   2013 WL 5568389 (N.D. Cal. Oct. 9, 2013) ........................................5

*Semgen v. Weidner*,
   780 F.2d 727 (9th Cir. 1985) ...............................................................4

*Stewart v. Smart Balance, Inc.*,
   2012 WL 4168584 (D.N.J. June 26, 2012) .........................................12

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ..............................................................4

*Viggiano v. Hansen Natural Corp.*,
   944 F. Supp. 2d 877 (C.D. Cal. 2013) ......................................9, 10, 11

*Wash. Mut. Bank, FA v. Super. Ct.*,
   24 Cal. 4th 906 (2001) ..................................................................16, 17

*Williams v. Gerber Prods. Co.*,
   552 F.3d 933 (9th Cir. 2008) ...........................................................6, 14

v

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001)..........................................................16

**Statutes**

15 U.S.C. § 2301(6)(A)........................................................................13, 14

15 U.S.C. § 2311(d) ............................................................................11, 12

21 U.S.C. § 343(a)..................................................................................8

21 U.S.C. § 350(c)(1)..............................................................................8

21 U.S.C. § 371......................................................................................12

21 U.S.C. § 393(b)(2)(A)..........................................................................12

Cal. Com. Code § 2313 ............................................................................9

Cal. Com. Code § 2314(1) .......................................................................10

Cal. Com. Code § 2314(2) .......................................................................10

Cal. Com. Code § 2315 ............................................................................11

**Rules**

Fed. R. Civ. P. 9(b) ...............................................................................4

**Regulations**

21 C.F.R. § 101.5(a)................................................................................18

21 C.F.R. § 101.62 ..................................................................................12

vi

1

**Other Authorities**

2

Z. Xia-Lui et al., *Relative Bioavailability Comparison of Different Coenzyme Q10 Formulations with a Novel Delivery System*, Alternative Therapies in Health & Medicine 15(2), at 42-46 (2009). ....................................................................1, 6

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Harris v. CVS Pharmacy, Inc.*, No. 13-edcv-2329-ABC (AGRx)
PLAINTIFF'S OPPOSITION TO CVS'S MOTION TO DISMISS

# INTRODUCTION

The Court should deny CVS's motion to dismiss the Complaint.

Plaintiff Leo Harris plausibly alleges CVS engaged in false advertising. Reliable laboratory testing demonstrates CVS's Ultra CoQ-10 does not rupture in the human body, preventing release of the chemical within, and rending false or misleading its "6X Better Absorption" claims. And even if it did adequately rupture, Ultra does not adequately dissolve, which is important because, as the study cited on Ultra's packaging states, "the dissolution of the drug is the first step in the absorption process," Compl. Ex. 2, *Relative Bioavailabilty* at 44.[1]

Plaintiff's testing followed the proper methodologies and standards of the U.S. Pharmacopeial Convention. CVS's assertion that plaintiff performed the incorrect tests is wrong because both oil- and water-based CoQ10 supplements are subject to the same rupture test if, like Ultra, they are packaged in soft shell capsules, and whether Ultra is oil- or water-based is actually unclear, and an issue of fact. Accepting plaintiff's allegations as true, his dissolution testing was therefore also proper.

CVS's contention that plaintiff's claims are not plausible because USP testing is voluntary, is misplaced. USP is the official compendium for dietary supplements under the Dietary Supplement Health and Education Act of 1994, and its definitions and standards are set by an unbiased expert scientific panel. Plaintiff does not allege that Ultra's testing failures are unlawful, but only that they plausibly demonstrate its "6X better absorption" claims are false. This also means there is no issue of "safe harbor," since plaintiff does not allege CVS violates USP.

Plaintiff also adequately alleges each of his warranty claims, and the federal Food, Drug and Cosmetic Act does not displace the Magnuson-Moss Warranty Act. CVS's

---

[1] Z. Xia-Lui et al., *Relative Bioavailability Comparison of Different Coenzyme Q10 Formulations with a Novel Delivery System*, Alternative Therapies in Health & Medicine 15(2), at 42-46 (2009).

arguments that plaintiff's allegations fail the reasonable consumer standard at the pleading stage only rehash its erroneous plausibility arguments about the implications of plaintiff's testing.

Finally, applying California's choice-of-law analysis, it is proper to apply Rhode Island law to the claims of a nationwide class, since CVS is headquartered there and the false representations emanated from Rhode Island, and because CVS, having raised choice-of-law issues, failed to meet it burden.

The Court should accordingly deny CVS's motion.

### FACTS

Coenzyme Q-10 occurs naturally in the body, and is commonly known as ubiquinone, ubidecarenone, or uniquinol, depending on its form. Compl. ¶ 13. CoQ-10 in the body can be depleted from aging or using statin drugs to lower cholesterol. *Id.* ¶ 14. Due to its heart-healthy properties, even though never approved by the FDA for such use, CoQ10 is one of the most widely sold dietary supplements in the United States, with 2011 sales in excess of $500 million. *See id.* ¶¶ 1, 15-16. It is well-known among dietary supplement users, however, that CoQ10 does not absorb readily in the human digestive tract. *Id.* ¶ 2.

Plaintiff purchased CVS Ultra CoQ-10 in about the Summer of 2012, relying on its packaging claims to offer "Heart & Muscle Health," and "6X Better Absorption" (and similar claims, like "over 600& better absorption"). Compl. ¶ 32 & Ex. 1. He "decided to pay what he thought was a higher price . . . specifically because of the comparative absorption representations on the Ultra box, which he understood to mean that Ultra had 6X and over 600% better absorption than the competing CoQ10 products that he had also been purchasing." *Id.* ¶ 33. However, "[i]ndependent laboratory testing, based on the USP test protocols, conclusively demonstrates that [Ultra] does not rupture within 15 minutes," as required by the USP CoQ10 monograph. *Id.* ¶¶ 19, 22, 34 & Exs. 3-5. In fact, most Ultra "did not rupture at all, even after 60 minutes." *Id.* ¶ 34 & Ex. 5. But "testing based on USP test protocols also conclusively demonstrates that the 2 pills that did rupture (finally after 50

minutes) only had a dissolution rate of under 28%," *id.* ¶ 35 & Ex. 5, far below the 75% USP requirement, *see id.* ¶¶ 23, 26 & Ex. 3.

CVS bases its absorption claims on a 2009 study, *Relative Bioavailability*, is cited on Ultra's packaging. *Id.* ¶ 6 & Exs. 1-2. Plaintiff alleges the study does not support, and actually contradicts CVS's "better absorption" claims. *Id.* ¶¶ 37-56. He alleges *Relative Bioavailability* has a flawed study design, based on an immaterial sample size, *id.* ¶ 38, unrealistic fasting conditions, *id.* ¶¶ 39-40, and improper exclusion criteria, *id.* ¶¶ 42-45. He alleges the study deceptively fails to reveal the products compared to the formulation tested and supposedly in Ultra. *Id.* ¶¶ 46-47. He alleges that the study is of limited initial value, with no verification of clinical response. *Id.* ¶¶ 48-49. He alleges the study was subject to bias because of sponsorship. *Id.* ¶¶ 50-53. And he alleges that *Relative Bioavailability* contradicts Ultra's "6X Better Absorption" claim because the results show the substance supposedly used in Ultra was just 499% and 286% better absorbed than two of the three comparators. *Id.* ¶¶ 54-56.

Based on his independent testing and indicia that *Relative Bioavailability* is unreliable and does not support its claims, plaintiff alleges CVS fails to provide consumers who purchase Ultra the "6X better absorption" advertised. *Id.* ¶¶ 57-63. Plaintiff further alleges CVS deceptively omits material information about *Relative Bioavailability*, despite citing the study to consumers on its label. *Id.* ¶¶ 64-67.

Plaintiff lost money in reliance on CVS's false or misleading representations, *id.* ¶¶ 68-72, so he brought this putative class action alleging violations of the consumer protection statutes of California, where he lives and purchased Ultra, *id.* ¶¶ 82-102, and Rhode Island, where CVS coined and issued the deceptive statements, *id.* ¶¶ 103-108. Plaintiff also alleges CVS breached express and implied warranties in violation of state and federal law. *Id.* ¶¶ 109-66.

3

**ARGUMENT**

## I.   PLAINTIFF SATISFIES THE APPLICABLE PLEADING STANDARD

Plaintiff's false advertising claims are subject to the heightened pleading standard of Rule 9(b). *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). To satisfy Rule 9(b), under which "all averments of fraud or mistake . . . shall be stated with particularity," allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semgen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Thus, "[a] pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).[2]

Contrary to CVS's assertion that the Complaint is "silent . . . and lacks particularity" on "'the time, place and manner of each act of fraud, plus the role of each defendant in each scheme,'" Mot. at 2 (quoting *Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991)), plaintiff's averments of fraud are "accompanied by 'the who, what, when, where, and how of the misconduct charged,'" including "'what is false or misleading about'" the challenged claims, and "'why [they are] false.'" *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1993); *Decker v. GlenFed, Inc.*, 42 F.3d 1541, 1548 (9th Cir. 1994)).

Plaintiff alleges the location and time of his Ultra purchase, Compl. ¶ 32, and identifies the specific packaging claims on which he relied, and that he challenges, *id.* ¶¶ 4, 28-32, 37,

---

[2] The state laws invoked in the Complaint do not require CVS's scienter, so its errant reference to the Complaint's supposed lack of "allegations concerning what CVS knew . . . , who at CVS allegedly possessed this knowledge, when the alleged knowledge was acquired or how the alleged knowledge was acquired," Mot. at 2, is misplaced. Even if that was an element of her claims, those items are within CVS's knowledge, and anyway, "the heightened pleading requirements of Rule 9(b) do not apply to allegations of knowledge, intent, or 'other conditions of a person's mind.'" *Kowalsky v. Hewlett-Packard Co.*, 2011 WL 3501715, at *3 (N.D. Cal. Aug. 10, 2011) (quoting Fed. R. Civ. P. 9(b)).

4

*Harris v. CVS Pharmacy, Inc.*, No. 13-edcv-2329-ABC (AGRx)
PLAINTIFF'S OPPOSITION TO CVS'S MOTION TO DISMISS

39, 42-43, 46-50, 53-54, 60-63. And plaintiff provides the accused packaging itself. *Id.* Ex. 1. He alleges CVS makes the challenged representations, and describes in detail why they are false or misleading. *Id.* ¶¶ 2-3, 5-6, 17-23, 34-63. And Plaintiff alleges CVS's deceptive omission of material facts with particularity. *Id.* ¶¶ 64-67. These allegations easily satisfy Rule 9(b). *See, e.g.*, *Bronson v. Johnson & Johnson, Inc.*, 2013 WL 5731817, at *6 (N.D. Cal. Oct. 22, 2013); *Rojas v. Gen. Mills, Inc.*, 2013 WL 5568389, at *7 (N.D. Cal. Oct. 9, 2013) (plaintiff "not only alleged the who, what, when, where, and how, but he attached images of the two products to the FAC, which helps him meet the particularity requirement for pleading purposes" (citations omitted)); *Dorfman v. Nutramax Labs., Inc.*, 2013 WL 5353043, at *12 (S.D. Cal. Sept. 23, 2013); *Aguilar v. Boulder Brands, Inc.*, 2013 WL 2481549, at *4 (S.D. Cal. June 10, 2013).

## II.    PLAINTIFF'S ULTRA TESTING SUPPORTS HIS CLAIMS

### A.    Ultra's Failure to Adequately Dissolve Raises a Plausible Claim that its "6X Better Absorption" Representations are False

CVS contends plaintiff "confuses" dissolution and absorption, arguing that the failure of a dietary supplement to dissolve does not render plausible claims that the supplement offers increased absorption. Mot. at 4-5. Because the Complaint alleges dissolution is a prerequisite to absorption, CVS's argument is unavailing. *See* Compl. ¶¶ 5, 21, 23, 26, 58-59, 63, 65.

Moreover, since the very study on which CVS relies for its "6X Better Absorption" claim admits "the dissolution of the drug is the first step in the absorption process," Compl. Ex. 2, *Relative Bioavailabilty* at 44, CVS is wrong that plaintiff's allegations are speculative or conclusory. Mot. at 11.[3]

Although CVS argues the virtues of *Relative Bioavailability*, Mot. at 12-13, this is a merits issue outside the pleadings. Its assertion that the study is not "fraudulent" because the

---

[3] As set forth in plaintiff's opposition to it, CVS's request for judicial notice is largely improper, seeking judicial notice of facts in dispute, and which are of a detailed, scientific nature, not readily ascertainable by reference to a single, undisputed source.

VesiSorb patent discloses the comparators used therein, is misplaced. Mot. at 13. Plaintiff does not allege the study is invalid for failure to reveal comparators, but that "Ultra's packaging" is "false or misleading," including because the study it cites obscures the comparators (hindering consumers who wish to investigate further). Compl. ¶¶ 37, 46-47; *see also id.* ¶ 66 (CVS deceptively omitted that *Relative Bioavailability* does not identify comparators).[4]

### B. Plaintiff's Claims Are Supported by Proper Testing, Applicable to Ultra

CVS contends performed the wrong testing. Mot. at 6-8. This is wrong. The Complaint alleges that "water-soluble forms of ubidecarenone, like the Ultra CoQ-10 soft gels, must 'meet the requirements for the test for *Dissolution*,'" *id.* ¶ 21 (quoting USP CoQ10 Monograph, Ex. 3). Accepting the allegation as true, CVS is wrong that plaintiff conducted the wrong testing because he used testing applicable to water-soluble formulations. Mot. at 6. CVS, however, asserts that plaintiff's allegation is contradicted by the *Relative Bioavailability* attached to the Complaint, which it argues "expressly states, the CVS CoQ10 is a lipid-based formulation." *Id.* CVS's analysis, however, is cursory and ultimately wrong.

Although the patented "VesiSorb" technology used to make the substance inside Ultra capsules "is a lipid-based formulation," it "naturally self-assembles on contact with an aqueous phase into an association colloid delivery system," Compl. Ex. 2, *Relative Bioavailabity* at 42. The VesiSorb patent, moreover, claims a "microemulsion preconcentrate" that contains CoQ10 suspended in various fats, which is then "mix[ed] . . . with water or an aqueous medium," to form the CoQ10 microemulsion in Ultra. Dkt. No. 15-11 at 1, claims 1-2. Thus, both *Relative Bioavailability* and the VesiSorb patent suggest the substance is CoQ10 initially suspended in oil (the microemulsion *preconcentrate*), then

---

[4] CVS's suggestion that reasonable lay consumers should be required as a matter of law to locate and review a patent—buried in a study buried in small print on a product's box, Mot. at 13—deserves short shrift. *C.f. Williams v. Gerber Prods. Co.*, 552 F.3d 933, 939 (9th Cir. 2008) (reasonable consumers are not "be expected to look beyond misleading representations on the front of the box to discover the truth . . . in small print on the side of the box").

dissolved in water to create the complete microemulsion supposedly inside Ultra capsules. At a minimum, this is an issue of fact not proper for resolution now. As pled, plaintiff's dissolution testing was entirely proper.

Even if it later turns out Ultra is not properly characterized as "a water-soluble form of ubidecarenone," Compl. Ex. 3 CoQ10 Monograph at 1462, plaintiff's allegations are still plausible. First, it is not clear the distinction makes a difference here. While CVS contends that dissolution testing is "not applicable" to Class I "Oil-Soluble Vitamins," Mot. at 7 (citing Compl. Ex. 4, USP <2040> at 2) it misreads this section, which *defines* "*Class I* dietary supplements a[s] combinations of oil-soluble vitamins for which dissolution standards are not established," Compl. Ex. 4, USP <2040> at 2.  Since CoQ10 has an established dissolution standard, *see* CoQ10 Monograph, Compl. Ex. 3, it is not a "Class I" vitamin. But even that doesn't matter, because "[v]itamin-mineral combinations that may not be strictly covered by USP Class I to Class VI are subject to the dissolution test and criteria specified in the individual monographs." Compl. Ex. 4, USP <2040> at 2.

Even if CVS were correct, while this might render the dissolution testing at worst superfluous, it would do nothing to undermine the implications of plaintiff's rupture testing, which is applicable either way. Under the USP monograph, CoQ10 must "Meet the requirements of the test for *Disintegration* [set forth in USP <2040>], except where the product is labeled to contain a water-soluble form of ubidecarenone," which must "meet the requirements for the test for *Dissolution*," Compl. Ex. 3, CoQ10 Monograph at 1462. If Ultra is not water-soluble, the USP <2040> Disintegration standard directs that, for "Soft Shell Capsules," "[p]roceed as directed under *Rupture Test for Soft Shell Capsules.*" Compl. Ex. 4, USP <2040> at 2. But if Ultra is water-soluble, USP <2040>'s Dissolution test directs that "[s]oft gelatin capsule preparations of dietary supplements" must "meet the requirements for *Disintegration*"—for which the rupture test applies.[5] Both paths lead to the same end.

---

[5] CVS argues plaintiff should have performed "strength" testing, asserting that he "alleges [Ultra's] label misrepresents the quantity of CoQ10 contained in the . . . supplements." Mot.

7

Although Ultra's failure to dissolve makes plaintiff's claims *further* plausible, these allegations are not crucial to plaintiff's claims, since the rupture test alone establishes the falsity of CVS's "6X Better Absorption" claims.

### C.    That USP Testing is Voluntary Does Not Render Implausible Plaintiff's Allegations that Ultra is Falsely Advertised

If Ultra fails USP's rupture test, its "6X Better Absorption" claims are plausibly false and misleading. It makes no difference that the USP testing plaintiff conducted prior to filing is voluntary for manufacturers. Mot. at 9-11. Plaintiff does not allege that Ultra's failure to achieve the USP standards is unlawful, but rather suggestive that Ultra does not provide "6X Better Absorption" as advertised. Given that the USP "set[s] standards for dietary supplements that are enforceable by the Food and Drug Administration," Compl. ¶ 17, and believes 15-minute rupture according to the test is necessary for efficacy, it is plausible CVS's "better absorption" claims are false or misleading.

CVS is thus wrong in asserting, without any authority, that failure to conform to a USP standard or test renders "a product is mislabeled *only if*" the product represents that it does so conform (and as a result is literally false). Mot. 11 (emphasis added). To the contrary, all dietary supplements, which are treated as foods under the FDCA, are subject to broad prohibitions against false and misleading labeling. *See* 21 U.S.C. §§ 343(a), 350(c)(1).[6]

## III.   PLAINTIFF STATES VALID WARRANTY CLAIMS

### A.    Plaintiff has Sufficiently Alleged Facts in Support of his Express and Implied Warranty Claims

Outside of blanket conclusory statements, CVS has failed to articulate any facts or adduce any supporting legal authority that would warrant dismissal of plaintiff's express and implied warranty claims.

---

at 8 (citing Compl. ¶¶ 37-56, 61). Contrary to CVS's assertion, which is unsupported by the allegations it cites, plaintiff does not challenge the quantity of CoQ10 in Ultra.

[6] *See generally* www.ftc.gov/news-events/press-releases/2010/05/ftc-submits-statement-congress-deceptive-marketing-dietary (last visited Feb. 13, 2014).

8

### i. *Express Warranty*

To prevail on a breach of express warranty claim under California law, a plaintiff must prove the seller (1) made an affirmation of fact or promise or provided a description of its goods; (2) the promise or description formed part of the basis of the bargain; (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff. Cal. Com. Code § 2313. "A description of the goods at issue can create an express warranty so long as it was part of the basis of the bargain between the parties." *Viggiano v. Hansen Natural Corp*., 944 F. Supp. 2d 877, 893 (C.D. Cal. 2013) (citing Com. Code § 2313(1)(b)). "No technical or particular words are necessary to create an express warranty," *Roberts Distrib. Co. v. Kaye-Halbert Corp*., 126 Cal. App. 2d 664, 668 (1954). "The existence of the warranty may be inferred from the affirmation of a fact which has induced the purchase and on which the purchaser was intended to and did rely." *Id*. at 669.

Plaintiff alleges CVS represented Ultra as having "6X Better Absorption" and "over 600% better absorption" than other CoQ10 dietary supplements. Compl. ¶¶ 4, 28 & Ex. 1. Through Ultra's packaging, CVS further "suggests that the product has certain health benefits, specifically by placing a claim on the package in three different places stating 'Heart & Muscle Health.'" *Id*. ¶ 31 & Ex. 1. CVS's statements formed the basis of the bargain in this instance because, in purchasing Ultra, plaintiff "relied on CVS's product claim as to 'HEART & MUSCLE HEALTH,' believing the product would provide heart health benefits. *Id*. ¶¶ 68-72. Further, "plaintiff decided to purchase Ultra rather than other CoQ10 dietary supplements specifically in reliance on CVS's repeated and prominent representations on the packaging that Ultra provides '6X' and 'over 600%' 'better absorption.'" *Id*. ¶ 32 & Ex. 1.

CVS breached these express warranties because "Ultra does not rupture timely or at all," so "the product cannot possibly provide adequate absorption for any reasonable effectiveness, and cannot possibly provide '6X' and 'over 600%' 'Better Absorption' over other widely available CoQ10 brands," *id*. ¶ 59. CVS's repeated reference to "Heart & Muscle Health" on Ultra's packaging "is also literally false or at least materially misleading and

1    deceptive, since the product is defective by not adequately rupturing and dissolving and

2    therefore provides no or little possible benefit to the heart and muscle health." *Id.* ¶ 63.

3        Plaintiff suffered damages as a result of CVS's breach because he "would not have

4    paid the price he did for Ultra, which is sold at a significant premium to some competing

5    products" if he knew the truth about its purported effectiveness. *Id.* ¶¶ 70-72.

6        Accordingly, plaintiff has alleged all necessary facts supporting of his express warranty

7    claims.

8                        ii.    ***Implied Warranties of Merchantability and Fitness***

9        "Unless excluded or modified [], a warranty that goods shall be merchantable is

10   implied in a contract for their sale if the seller is a merchant with respect to goods of that

11   kind." Cal. Com. Code § 2314(1). "Unless specific disclaimer methods are employed, an

12   implied warranty of merchantability arises and accompanies every retail sale of consumer

13   goods." *Viggiano*, 944 F. Supp. 2d at 896. "A plaintiff who claims a breach of the implied

14   warranty of merchantability must show the product "did not possess even the most basic

15   degree of fitness for ordinary use." *Id*. (citing *Mocek v. Alfa Leisure, Inc*., 114 Cal. App. 4th

16   402, 406 (2003) (citing Cal. Com. Code § 2314(2))).

17       Plaintiff alleges CVS markets, advertises and sells Ultra to consumers. Compl. ¶ 4. He

18   alleges Ultra did not possess the most basic degree of fitness for ordinary use because it does

19   not rupture and thus cannot possibly provide adequate absorption for any reasonable

20   effectiveness, thereby making any of its claimed health benefits false. *Id.* ¶¶ 57-63. Further,

21   Ultra's packaging lacks any sort of disclaimer that would otherwise guard against this

22   misconception. *See* Compl. Ex. 1. CVS thus breached its implied warranty of merchantability.

23       The Commercial Code also imposes an implied warranty of fitness for a particular

24   purpose. "Where the seller at the time of contracting has reason to know any particular

25   purpose for which the goods are required and that the buyer is relying on the seller's skill or

26   judgment to select or furnish suitable goods, there is unless excluded or modified under [§

27   2316] an implied warranty that the goods shall be fit for such purpose." *Viggiano*, 944 F.

28

                                          10

Supp. 2d at 896 (citing Cal. Com. Code § 2315). "The implied warranty of fitness is breached if the seller's product is not in fact suitable for the use intended by the purchaser." *Id*. (internal quotations and citations omitted).

Here, Plaintiff's Complaint alleges that Defendant markets and sells its Ultra product as having "6X Better Absorption" compared to other CoQ10 supplements on the market, because of a "patented VESIorb® technology from Switzerland." Compl. ¶¶ 4, 28. Ultra, however, is not fit for this particular purpose, increased absorption, because its soft gel capsules do not timely rupture and thus, cannot adequately dissolve and absorb, let alone provide "better" absorption than competing CoQ10 supplements. *Id.* ¶¶ 57-63. Ultra is not fit for the particular purpose for which it is advertised and sold.

*     *     *

The Complaint sufficiently alleges facts in support of plaintiff's claims for breach of express and implied warranties.[7]

### B.   Plaintiff's Magnuson-Moss Warranty Act Claims are not Barred

CVS asserts the Magnuson-Moss does not apply because plaintiff fails to plead a state law cause of action, but that is wrong for the reasons discussed above.

CVS next argues plaintiff's Magnuson-Moss claim is preempted by the FDCA pursuant to a provision stating that the Act is "inapplicable to any written warranty the making or content of which is otherwise governed by federal law," 15 U.S.C. § 2311(d). Mot. at 16.

Because § 2311(d) refers only to "written warranties," on its face it does not apply to plaintiff's Magnuson-Moss claims predicated on state law violations of implied warranties. But § 2311(d) is also inapplicable to the written warranties plaintiff challenges because they are not "governed by federal law," even if dietary supplement labeling in general is governed by the FDCA and DSHEA.

---

[7] CVS does not discuss plaintiff's warranty claims under Rhode Island law, since the analysis "would be identical," Mot. at 14 n.7.

11

*Harris v. CVS Pharmacy, Inc.*, No. 13-edcv-2329-ABC (AGRx)<br>PLAINTIFF'S OPPOSITION TO CVS'S MOTION TO DISMISS

1   Notwithstanding CVS's assertion that the FDCA "govern[s] written warranties on the
2   labeling of dietary supplements," there is no FDCA provision requiring or permitting CVS to
3   warrant that Ultra provides "6X Better Absorption" or "600%" better performance than rival
4   supplements. *Compare Stewart v. Smart Balance, Inc.*, 2012 WL 4168584, at *14 (D.N.J.
5   June 26, 2012) (Magnuson-Moss claims preempted because statement alleged to have created
6   written warranty, "fat free," was governed by specific federal regulation, 21 C.F.R. § 101.62,
7   so that "[t]o the extent that 'fat free' is the equivalent of 'defect free,' despite the fact that
8   compliant milk may contain no less than 0.5 grams of fat, the making or content of the claim
9   is governed by federal law").

10   In the only case CVS cites, *Bates v. Gen. Nutrition Ctrs., Inc.*, 897 Fed. Supp. 2d 1000,
11   (C.D. Cal. 2012), the court did not identify the statements plaintiff alleged to be written
12   warranties. But it relied on decisions that are distinguishable. *See id.* at 1002 (citing *Kanter*
13   *v. Warner-Lambert Co.*, 99 Cal. App. 4th 780, 798 (2002), *Hairston v. S. Beach Beverage*
14   *Co., Inc.*, 2012 WL 1893818, at *6 (C.D. Cal. May 18, 2012).

15   *Kanter* concerned an FDA-approved OTC drug label, and interpreted the Consumer
16   Product Safety Act's (CSPA) overlap with Magnuson-Moss, holding that because "a medical
17   device regulated by the [Medical Device Act] is not a consumer product within the meaning
18   of Magnuson–Moss," the OTC drug was also not a consumer product under CPSA and
19   Magnuson-Moss.[8] And *Hairston*, like *Stewart*, involved fruit statements in compliance with
20   specific FDCA regulations. *See* 2012 WL 1893818, at *1, *3-5. The plaintiff's Magnuson-
21   Moss claim could not stand because "FDCA and FDA labeling regulations govern the
22   Lifewater labeling challenged by Plaintiff." *Id.* at *5 (citing 21 U.S.C. §§ 371 &
23   393(b)(2)(A)).

24
25
26
27   _____
[8] *Bates* and *Kanter* were also decided on summary judgment. Here, at the pleading stage, the
Court lacks sufficient information to determine the applicability of 15 U.S.C. § 2311(d). *See*
28   *Rogers v. Dow Agrosciences, LLC*, 2006 WL 3147393, at *9-10 (W.D. Va. Oct. 31, 2006).

12

1   Courts interpreting *Kanter* have held the FDCA has nothing to do with voluntary
2   manufacturer statements outside the FDCA-regulated product packaging, which is the
3   appropriate view because nowhere in the FDCA is CVS mandated to make the "6X better
4   absorption" or the clinical proof claims at issue in this case. *See*, *e.g.*, *Forcellati v. Hyland's,*
5   *Inc.*, 876 F. Supp. 2d 1155, 1165 (C.D. Cal. 2012) (performing in-depth analysis of
6   Magnuson-Moss and CPSA, and concluding definition of a "consumer product" in CPSA did
7   not exclude Magnuson-Moss claim for a homeopathic drug, a lightly-regulated FDCA good
8   akin to a dietary supplement). Thus, federal law does regulate "the making or content of"
9   CVS's labeling at issue here. *See id.*

10   CVS also claims "6X times better absorption" supposedly "give[s] no assurance that
11   Ultra is defect free or meets a specified level of performance over a 'specified period of
12   time,'" for purposes of a Magnuson-Moss express warranty claim. Mot. at 16 (quoting §
13   2301(6)(A) of Magnuson-Moss). But this is exactly the type of "defect" or "performance"-
14   related defect that the Magnuson-Moss covers. 15 U.S.C. § 2301(6)(A). For example, in *Allen*
15   *v. Hyland's Inc.*, 2013 WL 1748408 (C.D. Cal. Apr. 11, 2013), the court held Magnuson-
16   Moss applies an allegedly ineffective dietary supplement. *Id.* at *6 ("While a product that is
17   'synthetic' and 'artificial' may not be defective, a product that is ineffective is.").

18   The same reasoning applies here because plaintiff alleges Ultra provides substantially
19   less CoQ10 absorption than the amount expressly or implicitly represented by its promises of
20   "6X Better Absorption" or "over 600% better absorption." *See* Compl. ¶ 160. In addition,
21   plaintiff alleges throughout the Complaint that Ultra's soft gel capsules are defective because
22   they do not rupture. This is a defect within the product's manufacture and design. *Compare*
23   Comp. Ex. 4, USP <2040> at 2 (noting testing "is intended to be diagnostic of known
24   technological problems that may arise as a result of coatings, lubricants, disintegrants, and
25   other substances inherent in the manufacturing process").

26   Thus unlike the *Hairston* decision on which CVS relies, which challenged claims that
27   a product was "all natural," plaintiff alleges a specific "defect," which is covered by
28

13

Magnuson-Moss, and problems with the specific levels of absorption promised. *C.f. Hairston*, 2012 WL 1893818, at *6 ("The challenged statements—'all natural with vitamins' and the names of various Lifewater flavors—are 'product descriptions' rather than promises that Lifewater is defect-free, or guarantees of specific performance levels."). Unlike the claims in *Hairston*, which convey a purported benefit of the product, Ultra promises "a specified level of performance," 15 U.S.C. § 2301(6)(A)—"6X Better Absorption—"over a specified level of time," *id.*, *i.e.*, implicitly, the time between when a person consumes Ultra and eliminates it. Thus, Ultra's absorption and strength promises speak directly to the effectiveness of the product. If the product is not effective, it is defective. Accordingly, Magnuson-Moss applies.

## IV. PLAINTIFF STATES VALID FALSE ADVERTISING CLAIMS

Plaintiff has adequately pled that he detrimentally relied on Ultra's packaging claims, and that they are likely to deceive the public and reasonable consumers.[9] CVS's "reasonable consumer" arguments merely rehash its erroneous plausibility arguments that plaintiff's testing is inapplicable because USP testing is voluntary,[10] and that *Relative Bioavailability* supports its claims. Mot. at 21-22. Although CVS makes some merits arguments outside the pleading about how reasonable consumers would likely interpret its "6X Better Absorption" claim, *id.* at 22, it cannot reasonably dispute that consumers minimally expect Ultra's capsules to rupture. Unlike the cases CVS cites, Mot. at 20-21, this is not one of the "rare situations in which granting a motion to dismiss is appropriate," *Williams*, 552 F.3d at 939.

## V. SAFE HABOR DOES NOT APPLY

CVS asserts that plaintiff "cannot sue CVS for not meeting USP standards," Mot. at 23, but this is not the nature of plaintiff's allegations that Ultra's "6X Better Absorption" and related efficacy claims are false and misleading. *Accord Hauk v. JP Morgan Chase Bank*

---

[9] CVS concedes all plaintiff's consumer protection claims, including under Rhode Island law, should be analyzed together, and that the applicable standard—likely to deceive a reasonable consumer, even if true—is objective. *See* Mot. 18-19.

[10] CVS asserts "reasonable consumers would not be mislead [*sic*] into believing that it had undergone and satisfied any USP testing," but that is not plaintiff's allegation.

14

*USA*, 552 F.3d 1114, 1122 (9th Cir. 2009) ("The safe harbor rule does not . . . prohibit an action under the unfair competition law merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct." (citing *Cel-Tech Commc'n, Inc. v. L.A. Cellular*, 20 Cal. 4th 163, 182 (1999) (internal quotations omitted)).

While the FDCA may not require CVS to meet USP standards to sell Ultra, CVS must still abide state consumer protection laws prohibiting false and deceptive advertising. The USP guidelines provide a relevant standard against which to judge CVS's conduct. Neither the FDA nor the FDCA require CVS to label Ultra with claims of "6X better absorption," or to bolster this claim with reference to a clinical trial. CVS's voluntary conduct can and has subjected it to a valid, plausible consumer protection lawsuit for false or misleading behavior. *See In re Horizon Organic Milk Plus Omega-3 Mktg. & Sales Practice Litig.*, 955 F. Supp. 2d 1311, ---, 2013 WL 3830124, at *24-25 (S.D. Fla. July 24, 2013) (no safe harbor where "neither the FDA nor the FTC approved [defendant's] labeling or advertisements"); *accord Consumer Justice Ctr. v. Olympian Labs, Inc.*, 99 Cal. App. 4th 1056, 1063 (2002) (not only is "there is no express preemption of cases involving the false advertising of dietary supplements in federal law under the Federal Trade Commission Act, the [FDCA], or the [DSHEA]," but given the purpose and history of DSHEA, "it would be more accurate to say the Act evidences, far from implied preemption, an instance of implied *non*-preemption").

## VI. PLAINTIFF CAN INVOKE RHODE ISLAND LAW FOR FALSE ADVERTISING EMANATING FROM CVS'S RHODE ISLAND HEADQUARTERS

By disputing the application of Rhode Island law to plaintiff's claims, CVS surreptitiously seeks to strike, in effect, the Complaint's nationwide class allegations, since as their representative and standing in their shoes, plaintiff's claims are typical of non-Rhode Island resident class members who also invoke Rhode Island law. CVS's 20-line argument, raising but barely even discussing a complicated choice-of-law issue, however, falls well

15

short of meeting its choice-of-law burden, requiring the Court to hold that the nationwide class can assert claims under Rhode Island law.

The question CVS raises is whether Rhode Island law may apply to the putative nationwide class, including consumers who purchased Ultra outside of Rhode Island? Plaintiff advocates application of Rhode Island law because CVS created and distributed the false advertisements from its Rhode Island headquarters, and thus applying Rhode Island law to the claims of the class comports with due process. CVS asserts that *plaintiff* "can sue only under California law," Mot. at 23, but does not advocate what law should apply to the claims of class members in the nationwide class. *See* Compl. ¶ 73.

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001), *amended* 273 F.3d 1266 (9th Cir. 2001)); *see also Klaxon v. Stentor Elec. Manuf. Co.*, 313 U.S. 487 (1941). Although decisions discussing California's choice-of-law analysis typically involve applying California law to a nationwide class, the California Supreme Court's decision in *Washington Mutual* suggests the analysis applies even here, where the California resident seeks application of foreign law, rather than California law, to a nationwide class. *Wash. Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 915 (2001) ("[W]hen there is no advance agreement on applicable law, but the action involves the claims of residents from outside California, the trial court may analyze the governmental interests *of the various jurisdictions involved* to select the most appropriate law." (emphasis added)).[11]

Under California's choice-of-law rules, when CVS challenges plaintiff's invocation of Rhode Island law to the nationwide class, plaintiff must initially demonstrate that applying Rhode Island law to the nationwide class comports with due process. *See Pecover v. Elec. Arts Inc.*, 2010 WL 8742757, at *17 (N.D. Cal. Dec. 21, 2010) (citing *Phillips Petroleum Co.*

---

[11] Accordingly, we modify in this section a few quotations to put "Rhode Island" in place of "California," while acknowledging such modifications with "*see*" signals.

*v. Shutts*, 472 U.S. 797, 818 (1985)). Even if Rhode Island law "may be constitutionally applied, California follows a three-step 'governmental interest analysis' to address conflict of laws claims and ascertain the most appropriate law applicable to the issues . . . ." *See Wash. Mut.*, 24 Cal. 4th at 919 (citations omitted). Nevertheless, "[i]f this due process test is satisfied, the presumption under California choice-of-law rules is that [Rhode Island] law applies," so that "the burden of proving otherwise rests with the party seeking to invoke [other] law." *See Pecover*, 2010 WL 8742757, at *17; *see also Wash. Mut.*, 24 Cal. 4th at 921 ("[S]o long as the requisite significant contacts to [Rhode Island] exist . . . California may constitutionally require the [Defendant] to shoulder the burden of demonstrating that [other] law, rather than [Rhode Island] law, should apply to class claims.").

## A.   Applying Rhode Island Law Comports With Due Process

Rhode Island law may constitutionally apply to a nationwide class if the state has a "'significant contact or significant aggregation of contacts' to the claims" asserted, such that "application of the forum law is 'not arbitrary or unfair.'" *Wash. Mut.*, 24 Cal. 4th at 921 (quoting *Shutts*, 472 U.S. at 821-22). In determining whether a significant contact or aggregation of contracts exists, "the focus . . . is on both the plaintiffs' and defendant's contacts with the forum state." *Pecover*, 2010 WL 8742757, at *17 (citation omitted). "[C]ourts consider 'where the defendant does business, whether the defendant's principal offices are located in [the state], where class members are located, and the location from which advertising and other promotional literature decisions were made." *In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237-38 (N.D. Cal. 2012).

This standard is generally satisfied in false advertising cases with respect to the state in which the defendant sits, as the creation and distribution of false statements from that state creates a "significant aggregation of contacts" to the claims of class members. *See id.* at 1238 (sufficient contacts where there were many California class members, and defendant did substantial business in California, had its principal place of business and corporate headquarters in California, decisions regarding the challenged representations were made in

1   California, and defendant's marketing activities were coordinated at its California

2   headquarters); *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1160 (C.D. Cal. 2012)

3   ("Plaintiff alleges that Defendants are headquartered in Los Angeles, California. Therefore,

4   application of California law poses no constitutional concerns." (citation omitted)); *Chavez*

5   *v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (similar); *Pecover*,

6   2010 WL 8742757, at *17 (California had significant contacts with class's claims where

7   defendant, among other things, included its California address on each video game package);

8   *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (C.D. Cal. 2008).

9        Here, CVS's Rhode Island headquarters are stated on Ultra's packaging, Compl. ¶ 9 &

10  Ex. 1, indicating Rhode Island is the "place of business of the manufacturer, packer, or

11  distributor." 21 C.F.R. § 101.5(a). Ultra's packaging claims were presumably created and

12  distributed from CVS's Rhode Island headquarters. Given these contacts between Rhode

13  Island and the class's false advertising claims, application of Rhode Island law to the class

14  does not offend due process.

15      **B.   CVS Admits Rhode Island Law is Identical to California Law and Has Not**

16             **Otherwise Shown Another State's Law Should Apply**

17      Where "plaintiffs show that application of [Rhode Island] law is constitutional under

18  *Shutts*, defendant must show that another state's laws apply under the California

19  governmental interest choice-of-law test." *See Parkinson*, 258 F.R.D. at 598. *See also Bruno*,

20  280 F.R.D. at 538 ("Under California law, once Plaintiff makes this showing that due process

21  is satisfied, the burden shifts to Defendants to show that the laws of another state should

22  apply."). Under the governmental interest test:

23          a court must: (1) first determine whether the relevant law is the same or different

24          across the affected jurisdictions; (2) if there is a difference in the law, proceed to

25          analyze each jurisdiction's interest in the application of its own law to the

26          particular circumstances to determine whether a true conflict exists; and (3) if a

27

28

true conflict exists, weigh the strengths of the interests to determine which state's interest would be more impaired by not having its law applied.

*Id.* at 539 (citing *Kearny v. Salomon Smith Barney*, 39 Cal. 4th 95, 107-108 (2006)). "The first step requires a court to find that there is a 'material difference' between the different states' laws 'on the facts of this case.'" *Id.* (quoting *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 995 (9th Cir. 2010)).

Here, CVS *concedes* California law is virtually identical to Rhode Island law. Mot. at 14 n.7 (analysis of warranty claims under Rhode Island law would be "identical"), 19 (Unfair and Deceptive Trace Practices Act "substantially similar to the California UCL"). Further, because CVS has "provide[d] no law from any jurisdiction for the Court to consider" applying to nationwide class members, it "fails to meet its burden." *Bruno*, 280 F.R.D. at 539. Accordingly, the Court should apply Rhode Island law to the nationwide class's claims. *See id.* at 540 (applying California law to nationwide class "because such application comports with due process and Defendants have not met their burden to show that the law of another forum is more appropriate"); *see also In re MDC Holdings Sec. Litig.*, 754 F. Supp. 785, 803-804, 808 (S.D. Cal. 1990) (applying California law to nationwide class where defendant "has not made any attempt to satisfy the [California] three-part governmental interest test"); *In re Seagate Techs. Sec. Litig.*, 115 F.R.D. 264, 269 (N.D. Cal. 1987).

CVS's reliance on *Mazza* is misplaced, as it did not disturb California's choice-of-law analysis requiring decision on a case-by-case basis. *See Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 545 (C.D. Cal. 2012) (denying motion to decertify nationwide class after *Mazza*, holding "California's choice-of-law analysis must be conducted on a case-by-case basis because it requires analyzing various states' laws under the circumstances of the particular case and given the particular legal issue in question." (internal quotations and citations omitted)).

## CONCLUSION

The Court should deny CVS's motion to dismiss; but if it is inclined to grant any portion of the motion, plaintiff respectfully requests leave to amend. Fed. R. Civ. P. 15(a)(2).

*Harris v. CVS Pharmacy, Inc.*, No. 13-edcv-2329-ABC (AGRx)
PLAINTIFF'S OPPOSITION TO CVS'S MOTION TO DISMISS

Dated: February 14, 2014          /s/ Jack Fitzgerald

**THE LAW OFFICE OF JACK
FITZGERALD, PC**
JACK FITZGERALD
MEHRAN TAHOORI
The Palm Canyon Building
2870 Fourth Avenue, Suite 205
San Diego, CA 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

**LAW OFFICES OF RONALD
A. MARRON, APLC**
RONALD A. MARRON
SKYE RESENDES
ALEXIS M. WOOD
651 Arroyo Drive
San Diego, CA 92103
Phone: (619) 696-9006
Fax: (619) 564-6665

***Attorneys for Plaintiff and the
Proposed Class***

*Harris v. CVS Pharmacy, Inc.*, No. 13-edcv-2329-ABC (AGRx)
PLAINTIFF'S OPPOSITION TO CVS'S MOTION TO DISMISS